FILED

NOV 12 2003

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

IN THE MATTER OF THE
EXTRADITION OF

ROGER LAWRENCE STRUNK,

aka ROGER LAURENCE STRUNK,
aka ROD LAWRENCE STRUNK,
aka ROD LAUREN STRUNK,
aka RAD LAUREN STRUNK
_______________________________/

No. MISC S-03-126 GGH

ORDER

*Introduction and Summary*

Roger Lawrence Strunk, a United States citizen, is in custody pursuant to a complaint and warrant of provisional arrest issued on May 12, 2003, seeking Strunk's extradition to the Republic of the Philippines. The Philippines requests a certificate of extradition, pursuant to an extradition treaty between the Philippines and the United States, so that Strunk may stand trial in the Philippines for the murder of Nida Blanca.

Extradition proceedings are ones of extreme sensitivity between sovereigns. No country should allow a citizen or resident to avoid foreign, legitimate criminal proceedings simply by reason of absence from the seeking country. Especially after September 11, 2001, countries should be sensitive to harboring accused criminals, or worse yet, terrorists, because world order depends on international respect for the legitimate laws of individual sovereign

nations. Failure to respect extradition requests can lead to animosity between the countries involved, including undignified reciprocity in the form of rejected extradition requests sought by the previously rejecting country.

However, all provisions of the extradition treaty must be honored including those which set minimum standards for permitting extradition in the first place. Article 7, Sec. 3 of the United States/Philippines extradition treaty applicable here provides: "a request for extradition of a person who is sought for prosecution shall be accompanied by such evidence as, according to the law of the Requested State [the United States], would provide cause for his arrest and committal for trial if the offense had been committed there." Def.'s Ex. A filed May 27, 2003. The issue here is whether this binding standard has been met. For the reasons set forth below at length, the court finds that it has not.

*Jurisdiction of the Undersigned*

Extradition proceedings are not Article III jurisprudential proceedings. Rather, the proceedings derive from Article II of the Constitution, and have been interpreted by the Supreme Court as necessarily involving the courts. See In re Kaine, 55 U.S. 103, 109, 14 L.Ed. 345 (1852); Matter of Requested Extradition of Smyth, 61 F.3d 711, 720 (9th Cir. 1995) ("[E]xtradition hearings [are] conducted under the authority of a treaty enacted pursuant to Article II."). Title 18 U.S.C. § 3184 provides:

> Whenever there is a treaty or convention for extradition between the United States and any foreign government, or in cases arising under section 3181(b), any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, or provided for under section 3181(b), issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered.

Without a doubt, the statute authorizes a magistrate judge to conduct all extradition proceedings,

and equally without doubt is the fact that the Eastern District of California, by local rule, has also authorized magistrate judges to conduct the proceedings. It is only because a court of this district advised in dicta that magistrate judges do not have such authority, that the court discusses this issue at some length. See In re Extradition of Singh, 170 F. Supp.2d 982, 992 (n.7) (E.D. Cal. 2001).

Eastern District Local Rule 72-302 sets forth the general assignments of cases and matters to magistrate judges. Because statutory authorization for magistrate judge jurisdiction appears in many different places throughout the United States Codes, and because new authorizations appear from time to time, the initial section of the Rule provides:[1]

> **General.** It is the intent of this Rule that Magistrate Judges perform *all duties* permitted by 28 U.S.C. §§ 636(a), (b)(1)(A), *or other law* where the standard of review of the Magistrate Judge's decision is clearly erroneous *or* contrary to law. *Specific duties are enumerated in subsection (b) and (c) of the Rule; however, those described duties are not to be considered a limitation of this general grant.*

(emphasis added).

As set forth above, the extradition statute is the "other law" which authorizes magistrate judge jurisdiction, and the local rule authorizes the magistrate judge to act in such a situation.[2] As the Rule expressly contemplates, the specific duties set forth in the local rule (for purposes of notification convenience to practitioners) does not act as a limitation of the general grant. And, the right of "review" enjoyed by the petitioner[3] in an extradition proceeding, a habeas corpus action, see Hooker v. Klein, 573 F.2d 1360, 1364 (9th Cir. 1978), has as its standard of review

---

[1] The undersigned was the author of this particular rule along with Judge Moulds of this district. Although the issue of jurisdiction is decided by the plain meaning of the Rule's words, to the extent there is any dispute about the underlying intent, the undersigned can speak with some authority on that matter.

[2] The general grant of authority in the local rule was designed such that it would not have to be amended every time a new statutory authorization was added or one was deleted.

[3] Neither the requesting state, nor the extraditing state has a right of appeal, or of course, a right to seek habeas corpus. See footnote 29 supra.

one of clearly erroneous on the facts and contrary to law (de novo) on legal issues. Mainero v. Gregg, 164 F.3d 1199, 1205 (9th Cir. 1999) (clear error on the facts) (superseded ... see cite at 12); Theron v. United States Marshal, 832 F.2d 492, 495 (9th Cir. 1987) (contrary to law-de novo on legal issues), abrogated on other grounds United States v. Wells, 519 U.S. 482, 117 S. Ct. 921(1997).

In re Extradition of Singh, supra, contains an exhaustive analysis of extradition of law which is relied upon by the undersigned infra for his substantive analysis. By way of a one sentence background introduction, Judge Wanger remarked that the local rules of this district did not permit magistrate judges to conduct extradition proceedings. 170 F. Supp.2d at 992 (n. 7). The issue of magistrate judge authority was in no way involved in that case, and no further analysis of the issue was made. It is clear that Judge Wanger did not intend to analyze the issue; therefore, the court follows the clear lines of authority set forth by the statute and local rule authorizing magistrate judges to preside in extradition proceedings.

In an abundance of caution, and at the express request of the parties, the undersigned submitted a referral order pursuant to § 3184 to the Honorable Garland E. Burrell which he signed directing the undersigned to conduct the proceedings. The undersigned does not believe such was necessary, but it exists for whoever would question the authority of the undersigned to proceed.

*General Extradition Legal Standards*

The judge in an extradition proceeding applies a standard similar to that of a preliminary hearing, determining whether the evidence justifies holding the accused for trial, not whether the evidence may justify a conviction. See Matter of Extradition of Powell, 4 F. Supp.2d 945 (S.D.Cal., 1998). The analysis is parallel to that used in determining whether evidence demonstrates probable cause to charge the crime.

In order to find Strunk extraditable, the following must be shown:

\\\\\

(1) The court has jurisdiction over the subject matter and the fugitive;

(2) The crime for which surrender is requested is an extraditable offense covered by a valid and enforceable treaty; and

(3) Competent evidence is sufficient to demonstrate probable cause that the accused committed the alleged offense.

18 U.S.C. § 3184.

The parties do not dispute whether jurisdiction exists over the subject matter and the fugitive, whether Strunk is the person sought by the Philippines, and whether the crime, also a criminal offense in the United States, is an extraditable offense covered by a valid and enforceable treaty. The court finds that the forgoing requirements for extradition exist. The only dispute is whether competent evidence demonstrates probable cause that Strunk was involved in the murder of Nida Blanca.[4]

The requesting country is not required to submit all its evidence, and the district court considers only probable cause, not whether the evidence is sufficient to convict. Singh, 170 F. Supp.2d at 993. The district court determines only whether probable cause exists to believe the extraditee committed the charged crimes. Quinn v. Robinson, 783 F.2d 776, 782-83 (9th Cir.1986). Another way of putting the matter is that extradition must be allowed if there is a reasonable belief that the extraditee committed the crime and competent evidence supports that belief. Mainero, 164 F.3d at 1205.

The probable cause standard is flexible. The Supreme Court has acknowledged:

> Articulating precisely what "reasonable suspicion" and "probable cause" mean is not possible. They are commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent

---

[4] Nida Blanca was the stage name of Dorothy G. Jones. At times the evidence submitted by the Philippines refers to the murder victim as "Nida Blanca," at other times as "Dorothy Jones" or "Dory" or "Tita Dory." The court will refer to the victim as Nida Blanca, or Blanca.

> men, not legal technicians, act. As such, the standards are not readily, or even usefully, reduced to a neat set of legal rules.

Ornelas v. U.S., 517 U.S. 690, 695-96, 116 S. Ct. 1657, 1661 (1996) (quotations and citations omitted); see also U.S. v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) ("The determination of whether probable cause exists in a given situation involves examining the totality of the circumstances in a common sense manner."); U.S. v. Hayes, 236 F.3d 891, 894 (7th Cir. 2001) ("The probable cause standard is a flexible, practical common-sense one which is met if the facts are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed."); U.S. v. Gilliam, 167 F.3d 628, 633 (D.C.Cir.1999) ("[A]rticulating when probable cause exists is a 'common sense' determination, which turns on the 'practical considerations of everyday life.'"). "[T]he extradition judge makes credibility determinations as to the competence of the evidence supporting probable cause." In re Singh, 170 F. Supp.2d at 1023.

The court has limited discretion in determining what evidence to admit in opposition to an extradition request. Singh, 170 F. Supp.2d at 993. The general "rule of non-contradiction" holds that evidence may not be offered to contradict testimony or challenge the credibility of a requesting country's evidence. See, e.g., Justice Denied? The Adjudication of Extradition Applications, 37 Tex. Int'l L.J. 277, 312 (2002); Hooker v. Klein, 573 F.2d 1360, 1369 (9th Cir. 1978). Anomalously, however, a fugitive nevertheless can "offer evidence that tends to explain the government's case of probable cause." Id., at 1368 (citation omitted). The distinction between evidence which "explains" and evidence which "contradicts" seems metaphysical. On one side of the line, the court cannot weigh conflicting evidence to make factual determinations. On the other side, an accused nevertheless is permitted to produce evidence in an attempt to "negate" or "obliterate" probable cause. See e.g., Hooker 573 F.2d at 1369; Singh, 170 F.Supp. 2d at 994 ("In practice, the standard is extremely difficult to apply"); Sandhu v. Burke, 2000 WL 191707 (S.D.N.Y., Feb 10, 2000); In re Extradition of Okeke, 1996

WL 622213 *3 (D.N.J., 1996). In permitting the introduction of explanatory evidence, "the intention is to afford an accused person the opportunity to present reasonably clear cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause." In re Singh, 170 F. Supp.2d at 994 (quotation and citation omitted). Seemingly, as the court has previously commented, the situation is analogous to a person attempting to ignore an "elephant in the living room." At some point, the "elephant" cannot be ignored. Inconsistent evidence may cause the "elephant" to grow to such proportions that no reasonable person or jurist would find it likely (as opposed to merely suspicious) that Strunk was complicit in his wife's murder.

International extradition proceedings are not governed by the Federal Rules of Evidence, the hearsay prohibitions, or the Sixth Amendment speedy trial guarantee. See Fed. R. Evid. 1101(d)(3); Quinn v. Robinson, 783 F.2d 776, 815 (9th Cir.1986); 18 U.S.C. §3172(2), Jhirad v. Ferrandina, 536 F.2d 478, 485n.9 (2d Cir. 1976).

*General Evidence of Record*

The record in this case is a confusing mish-mash of declarations within declarations, some containing argument, and some only facts. Other exhibits are interspersed either on their own or as "support" for someone's declaration. Moreover much individually submitted evidence is duplicated as attachments to other submittals. The exhibits (sometimes referenced as "annexes") are labeled with a multitude of references. "Evidence" was also submitted prior to the extradition hearing itself in connection with the bail proceeding. In order to bring some order to the record, the court sets forth what it has and has not relied upon.

First, unless duplicated in filings at the extradition hearing itself, evidence submitted prior to the extradition proceeding itself, e.g., bail issue, has not been considered. The formal extradition "package" and other evidence proffered by the Philippines for the hearing itself have been considered in their entirety. Given the standards regarding "conflicting" evidence, only certain submittals proffered by Strunk at hearing have been considered, and those

are clearly identified below. The court will not consider the belated evidence submitted by the Philippines filed November 3, 2003. This extradition proceeding is not some movable feast—never to be finished as long as the parties drip evidence into the undersigned, when they feel moved to do so, or after the undersigned makes a comment on the submitted evidence at hearing or in writing. Due process required the parties to submit what evidence they desired at, or in conjunction with, the hearing itself.

*Framework of Analysis*

The parties agree on certain facts and these will first be set forth. The initial confession of Medel is clearly the pivotal evidence submitted by the Philippines in connection with *Strunk's* complicity in the murder of Nida Blanca. It will be analyzed next, together with circumstances surrounding the making of the confession as well as the facts and circumstances of the asserted recantation. The remainder of the evidence submitted by the Philippines will then be examined. The vast majority of this evidence has to do with corroboration of Medel's participation in the murder. Strunk's counsel is correct to remind the court that the extradition hearing here involves Strunk and not Medel, but he is incorrect as to the potential usefulness of the Medel corroborating evidence. To the extent that aspects of Medel's confession are corroborated by this other evidence, the more likely it becomes that his statements about Strunk also are true. Of course, the opposite is true as well; to the extent that the asserted corroborative evidence is itself inconsistent with Medel's confession or otherwise unreliable, it becomes less likely that any statement by Medel is to be believed. After examination of all of the Philippines' evidence, selected, appropriate evidence submitted by Strunk will be discussed.

*Undisputed Facts*

First, however, the following facts are not disputed. See declaration of Dina Joy C. Tenala, State Counsel of the Department of Justice of the Republic of the Philippines, Extradition Documents. Strunk's wife, Dorothy Jones, known by the stage name Nida Blanca, a popular actress beloved in the Philippines, was found dead in her car in the parking garage of her

office building on the morning of November 7, 2001. Blanca died from multiple stab wounds in her head, neck, and thorax, inflicted by a single bladed weapon measuring at least 5.5 centimeters. Annex D., ¶¶ 8-13; see also Annex E. The approximate time of her death was 4:00 a.m. Id., at ¶ 10. The forensic expert stated there were no defense wounds usually associated with a struggle. Id., at ¶ 18. There were no signs of a struggle inside the vehicle. Id., at 24. On November 18, Pedro Philip Medel, Jr., also known as Jun Medel, confessed to the Criminal Investigation Detection Group of the Philippine National Police (CIDG-PNP) that he was the killer.[5] Medel's statements implicating Strunk as the instigator of the crime were executed on November 18, 2001, and November 19, 2001. See Annex F, G, & I. Although the exact amount is in question, undisputed in this case is that at the insistent request of Medel, Medel's family was paid in consideration for Medel's confession by Philippine government authorities: Supt. Versoza declares Medel requested his family be sent 20,000 pesos, and that 10,000 pesos was sent to Medel's family. Annex M., ¶¶ 03.07; 03.13.[6] At a televised preliminary investigation held November 23, 2001, however, Medel recanted his confession in open court, alleging it had been obtained through coercion and torture. See Annex K. The prosecutors then remanded the case to the Philippine National Police ("PNP") and the National Bureau of Investigation "(NBI") for further investigation. Id. Medel was transferred to the NBI for custody. Following another preliminary investigation lasting several days, held on August 12 & 26, September 12, October 1 & 21, 2002, the investigating prosecutors found probable cause to indict and file murder charges against Strunk and Medel.

---

[5] In his confession, Medel's name is given as Philip L. Medel, Jr. Annex F, G. In the Information filed in Philippines Regional Trial Court, the name is Pedro Philip L. Medel Jr. Annex A.

[6] Versoza's declaration refers to a receipt attached as Annex K. The court was unable to locate an Annex K to Annex M. In addition, AUSA Melkian confirmed that the evidence of payment was undisputed. The court has struck the after-hearing submissions proffered by the Philippines. However, it is interesting to note that the payment to Medel (his family) is again confirmed by government authorities.

*The Medel Confession, Recantation and Circumstances Surrounding These Events*

Potentially, the most pertinent evidence connecting Strunk to the murder of Nida Blanca is the November 18, 2001, confession of Medel. Annex F, G. It is the only evidence given by someone with supposed direct, personal knowledge of Strunk's involvement. Medel declared that a Filipino named Mike Martinez recruited him in early October, 2001 to participate in a project identified as the "Tantoco Project." In late October, 2001, Martinez advised Medel that the subject of the project was "the wife of a chinese who swindles." Id. at ¶ 7. They were to be paid 50,000 pesos to "observe" the project. Id. On Tuesday, November 6, 2001, Martinez called Medel, and arranged a rendezvous with Medel at an agreed upon location. Id. at ¶¶ 8-9. At approximately 5 p.m., a man with Caucasian features who was a passenger in a beige car, pulled up to where Medel was waiting and asked him whether he was in fact Medel. Id. at ¶10. When Medel confirmed and inquired as to the whereabouts of Martinez, Medel was directed to get in the car. Id. They drove past the Kamayan Restaurant, where Medel had been told Martinez was waiting, and then proceeded to another location where they arrived two hours later. Id. "Rad" (presumably the Caucasian-featured passenger) rode around with Medel, looking for a "troublesome person," whom he did not find. They returned to the Kamayan Restaurant at approximately 9:00 p.m. Id. "Rad" made cell phone calls and also instructed Medel while they ate dinner. (Medel was to act as an observer and intimidate the "wife of the Chinese.") Id. Although Medel had expected Mike Martinez to accompany them, Martinez never showed up.

"Rad" and Medel left the restaurant "at about past 10:00 p.m." and drove, now in an avocado green car, to the 6th floor of the Atlanta parking garage. Id. They parked next to a dark green car, where they remained until about 12:00 a.m., when "Rad" told Medel he was leaving and that Medel should wait in the back seat of the dark green car, which "Rad" then unlocked. Id. Medel spent the time waiting in the back seat by texting messages to his friends, and eventually fell asleep, until he was awakened about 1:00 a.m. by lights from a car parking in the adjacent space. "Rad" and two other women got out of the car. The victim was dressed in "a

long vertical stripes long sleeved blouse with dark pants." "Rad" pushed the victim into the back seat. Id. "Rad" and the other woman kicked and struck the victim. Medel joined in, hitting the victim and finally stabbing her with his knife in the left side of her body and neck. Id. Medel, Rad, and the other woman then left the Atlanta garage at 2:00 a.m. Id. Medel was dropped off and returned to his home where he hid the knife under his kitchen sink. Id. Medel was "shock" to learn a couple of days later that the victim was Nida Blanca. Id.

On November 19, 2001, Medel executed another statement, affirming the November 18, 2001 confession. Annex I. He stated that he first believed only Mike Martinez was planning the crime, "but later found out that another person whom I was able to personally meet and of whom I have identified as RAD, a caucasian with two(2) others were the mastermind." Id., at ¶17. Medel also stated that he had "no regrets except that I have been continuously bothered by my conscience after finding out later on that the person I have killed was NIDA BLANCA." Id. at ¶18.

Inferences pertinent to Strunk's case to be drawn from Medel's confession that he stabbed and killed Nida Blanca are that Strunk was the instigator of the crime; that Medel and Strunk did not know each other prior to their November 6, 2001 meeting; that Medel did not know Nida Blanca was the proposed victim; that, notwithstanding that he unhesitatingly killed the victim, Medel was not initially recruited to kill; and that Medel did not know until two more days later that the person he killed was the famous Nida Blanca.

The confessions themselves,[7] superficially, might be sufficient to demonstrate a reasonable belief that Strunk was complicit in his wife's murder, but the court notes the initial seeds of incredibility that will later grow into large trees. First, as is evident throughout most of the declarations in this case, the first statement is never good enough. There always seems to be a need to embellish what was initially said in order to make the case better. This fact is not

[7] The court will term all statements as confessions in the plural.

necessarily detrimental, but importantly, the embellishments contain significant inconsistencies. In the first confession, it is evident that Medel had never personally met Strunk until right before the murder, but by the very next day of the second statement, Medel "later found out that another person whom I was able to personally meet and of whom I have identified as RAD, a caucasian with two(2) others were the mastermind" for the murder of a person he supposedly did not know at the time. Going from Medel not knowing Strunk, to Medel knowing that Strunk was the mastermind—all in the space of a day according to the two statements—would give pause to any reader, and gives impetus to the idea that Medel was being fed facts.

The confessions receive their next body blow by recognition of the fact that Medel received compensation for his family by virtue of his confession. Payment to a defendant to confess his and others participation in a murder will cast doubt on the validity of the statement. Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) ("The [fact-finders] estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."). [8]

This brings the court to the matter of the recanted confessions. Whether to admit recantation evidence in an extradition hearing has not been decided by the Ninth Circuit. See Mainero v. Gregg, 164 F.3d 1199, 1207, n. 7 (9th Cir. 1999) (superseded by statute on other grounds, Cornejo-Barreto v. Seifert, 218 F.3d 1004 (9th Cir.2000)). Courts have been split on the issue. See Singh, 170 F. Supp. 2d at 1016–1017 (collecting cases); United States v. Linson, 88 F. Supp.2d 1123, 1126 (D. Guam 2000) (citing cases). Where the only evidence to support probable cause is the unrecanted confession, courts have admitted the recantation as obliterating probable cause. See Linson, 88 F. Supp.2d at 1126; Matter of Extradition of Contreras, 800

[8] The total sums involved, 10,000 or 20,000 pesos, while not large sums of money in American dollar standards, may well be significant in the Philippines. And, it is not the actual sum of money paid to Medel's family which is important for credibility purposes, it is the amount Medel *thought* he was being paid that matters with respect to *his* credibility.

F.Supp. 1462, 1469 (S.D. Tex. 1992). Comparing indicia of reliability of the original confession and the recantation confession can also assist the court in determining whether to admit the recantation. See Contreras, 800 F.Supp. at 1468 (considering reliability of recantations in light of circumstances surrounding original statements); Eain v. Wilkes, 641 F.2d 504, 511-12 (7th Cir. 1981)) (recantation made in private not as reliable as inculpating statement made in open court). The court determines to consider the recantation, since it was presented by the Philippines, and will give it the weight that it deserves.

At a videotaped hearing held in the Philippines on November 23, 2001, Medel dramatically repudiated the confessions. This video, introduced by the Philippines, was played in the courtroom at the extradition hearing. Medel claimed the confession was extorted from him by torture, he denied knowing Rod Strunk, and he denied any participation in the murder of Nida Blanca. This recantation, by itself, would not persuade the court, in that the histrionics of the occasion, as if Medel were possessed by demons, seemed a bit much to be worthy of credence. (More will be said later on allegations of torture). It does, however, give the court pause to wonder whether Medel could be believed on any particular day, whether he was confessing or recanting. The contrast between the eerily casual atmosphere at his confession (this execution of his confession was also played to the court in a video) and the dramatic recantation does not give the court much confidence in the bona fides of either day.[9]

*Other Evidence Supplied by the Philippines*

Thus, the paid-for confessions, unbelievable in at least one important particular, made by a person who seems generally unworthy of belief, are wobbly indeed at this point, especially with respect to Strunk's involvement. However, as stated above, corroboration of Medel's confessed activities might shore up these wobbly confessions vis-a-vis his allegations

---

[9] The court emphasizes that in order to gain a "common sense" impression of probable cause, (reasonable belief supported by competent evidence), or the lack thereof, assessments must be made of the collective evidence supplied by the Philippines.

against Strunk even if the corroboration does nothing more than solidify the case against Medel. Unfortunately, the evidence supplied by the Phillipines government undercuts whatever support the confessions have at this juncture.

To prove that Medel and Strunk were involved in the murder, the Philippines proffers several sworn statements of Leonilo "Nilo" Gonzaga. The first statement, given February 2, 2002, implicates Medel as the hired killer who knew Strunk and had been overheard speaking to him on a cell phone. Although offered to corroborate Medel's repudiated confession, Gonzaga's statement differs in several significant respects from Medel's account. For example, Gonzaga indicates that Medel knew Strunk well prior to the night the murder was committed, that Medel was hired for the express purpose of killing Nida Blanca, whom Medel knew was the intended victim, and that Medel had tried to recruit others to participate in the murder. Annex T-2. The court has scrutinized the statements of Gonzaga carefully, and will summarize salient parts of his statements, beginning with the February 2, 2002 statement, contained at Annex T-2.

Gonzaga, a security officer, and Medel resided in rooms at the same warehouse. Id., ¶ 7. Gonzaga worked as a security officer for an agency of which Rolly Kintanar was president. Id. at ¶2. Gonzaga first knew Medel when Medel lived in the home of Gen. Galileo Kintanar.[10] Id. at ¶ 7. Medel thereafter, in June, 2001, moved to the same place as Gonzaga, where Medel occupied another room with Dodong Polinar. Id. Medel told Gonzaga he was one of Gen. Kintanar's "men." Id. Medel and Polinar told Gonzaga that they "usually" went to a sing along piano bar with Rod Strunk. Id., ¶ 19.

In October, 2001, Medel asked Gonzaga if he knew a killer because Medel wanted to kill someone for money. Id. at ¶11. Gonzaga overheard Medel ask another friend, Major Pates, the same question. Id. Medel a second time asked Gonzaga if he knew a killer, and the

---

[10] The court understands that Rolly Kintanar was the nephew of Gen. Galileo Kintanar. See Strunk's Ex. 8.

next day Medel specifically identified Nida Blanca as the person he planned to kill. Id. On November 5, 2001, Gonzaga overheard Medel take a call on his cellphone. Id., ¶13. Speaking English, Medel said, "Hi Rod, how are you?" Id. Gonzaga heard Medel make plans to meet the caller. Id. [11]

About 8:00 a.m. on November 7, 2001, (the morning the body of Blanca was found), Gonzaga observed an agitated Medel complaining about being deceived and also overheard him making plans to meet someone he called "Colonel." Id. Medel was still in his room at 9:00 a.m. when Gonzaga left. Id. That evening, Medel was still uneasy. Id., ¶ 15. Medel left the house on November 8, 2001 and did not return until November 13, 2001. Nevertheless, on November 10, 2001, Medel admitted to Gonzaga that he had killed Nida Blanca. Id., ¶5. Seemingly, that conversation took place face to face–Gonzaga states Medel "approached" him on that day to say he had "accidentally" killed Nida Blanca. Id., ¶15. Id. The statement suggests Rolly Kintanar also was present on November 10. Id., ¶ 5 ("He told me that he is the one who killed NIDA BLANCA. He likewise mentioned this to Rolly Kintanar in my presence.").[12]

In ¶ 15 of the February 2, 2002 statement, Gonzaga elaborates on Medel's supposed November 10, 2001 confession to him. Importantly, Gonzaga declares he then (on November 10, 2001) called Col. Versoza of the CIDG-PNP and told him Medel wanted to surrender. According to Gonzaga, Versoza and Medel then talked by telephone on that same day. ("The two of them talked together (Col. VERSOZA and JUN MEDEL) over the phone and they agreed to meet at Sta. Clara Church, Katipunan, Quezon City at around 5:00 in the morning of November 17, 2001. At this point, JUN MEDEL asked me to accompany him on the said

---

[11]Gonzaga's statement indicates that Medel was to meet someone, presumably Martinez or Strunk, on the evening of November 5. However, the events recounted by Medel indicate that the meeting took place on November 6.

[12] Rolly Kintanar has since been murdered.

date.") No explanation of why the PNP would delay one week before taking Medel into custody is proffered. No explanation of why Medel agreed to surrender on November 17, but did not do so until November 18, is proffered—"That is why on November 18, 2001 at around 5:00 in the morning, I [went] together with PHILIP MEDEL . . . [who] voluntarily surrendered to them." Id., ¶ 15.

Gonzaga gave another statement approximately a year later on March 3, 2003. Annex. U-1, affirming that he knew Rod Strunk, and had seen him twice, in September, 2001 and again on November 5, 2001, at the home of Gen. Kintanar. The sighting of Strunk on November 5, 2001 at Kintanar's home is surprising—Gonzaga's February, 2002 affidavit, which recounts the overheard November 5, 2001 call from Medel to "Rod," fails to mention that Gonzaga also had seen Strunk at Gen. Kintanar's home on the same day. In fact, in the February affidavit, Gonzaga states that he had been "home" in Samar since October 29, returning in the company of a relative on November 5, 2001, when they (Gonzaga and his relative) "chanced upon Medel" about 2:00 p.m. "putting some color in his hair and shining shoes." ¶13. The inference is that Gonzaga and his relative had just returned when they saw Medel. How or at what time Gonzaga saw Strunk at Gen Kintanar's home on the same day, and why he did not earlier mention that fact, is unexplained.

On June 23, 2003, almost two years after the crime, and after this court entered its order denying bail, Gonzaga gave a third statement. Annex V-1. Apparently responding to concerns expressed by this court at the previous bail hearing, Gonzaga explains that he in fact did speak face to face with Medel on November 10, 2001, but the 20 minute conversation took place in his car in the parking lot of their apartments. Id., ¶¶6-7. Nothing indicates Kintanar was there too. No mention is made of a telephone call to PNP official Versoza. Gonzaga declares Medel was angry that Strunk had not paid him, wanted to surrender, to pinpoint Rod Strunk as the mastermind, and to have Strunk arrested. Id., ¶ 8. In his June 23, 2003 statement, Gonzaga states that Medel called him as often as 20 times a day after he left his apartment on November 8,

2001, and also reached him through "text" as often as 30 times, asking if people were looking for him. Id., ¶¶ 9-12. In this most recent statement, Gonzaga recounts a specific meeting at General Kintanar's house in September or October, 2001 with Strunk, Noel De La Paz, Bernardita De La Paz, Ding Ding Tantoco, Mike Matinez [sic] and Elena De La Paz.[13] There is no mention of Medel at the meeting. Gonzaga declares he had seen Strunk, together with the De La Paz family members, as well as Tantoco and Martinez, at Kintanar's home about four times. Id., ¶ 15-17. That he had seen Strunk at Kintanar's home four times contrasts with his previous statement that he had seen Strunk there twice.[14] Gonzaga also states that he was at General Kintanar's house after the press conference documenting Medel's surrender, when he overheard Medel call Kintanar and Kintanar inquire why Medel had surrendered. Id., ¶ 25. Kintanar passed the phone to Gonzaga, who personally spoke to Medel, who said he would not have surrendered had "Kano" paid him.[15] Id.

Pedro Pates, Jr. executed an affidavit dated November 22, 2001. Annex W. Pates declares he met Medel at Medel's room on October 25 and November 13, 2001. Id., ¶ 1. He declares Medel asked him on October 25 if he knew someone who would kill an actor or an actress. Id., ¶2. Pates overheard Medel talking on a phone to "Rod." Id. Pates saw Medel on November 13, 2001 when Medel looked disturbed. Pates jokingly advised him of surveillance,

---

[13] With the exception of the recently "disappeared" Mike Martinez, who, as one will recall was the primary planner of the murder according to Medel, and who remained surprisingly unavailable and silent throughout the evidence in this case, the remainder of the persons involved in the alleged meeting were either close friends, confidants or personal workers for Nida Blanca. Thus, it is especially surprising that the identities of these persons at a meeting place with some connection to Medel was not first and foremost in Gonzaga's initial statement.

Various spellings of proper names appear in the submitted papers, although the identities of the persons referred to are not in doubt. The De La Paz name is variously referred to by the spelling "Dela Paz." To be consistent, the court has spelled the name De La Paz, and proffers apologies if the surname is misspelled.

[14] No explanation has been proffered to explain the connection of Kintanar, if any, to the murder.

[15] "Kano" is slang for "American."

and Medel stated he was not worried. Id. Gonzaga told Pates on November 18, 2001 that Medel had confessed to the murder. Id. at ¶4.

Pates also executed a supplemental affidavit on June 25, 2003. Annex W-1. Although it was offered to clarify a second sworn Pates statement dated July 30, 2002, the court did not discover that affidavit in the materials submitted by the Philippines. Pates declares in the June 23, 2003 affidavit that he was with Gonzaga at Gen. Kintanar's residence on November 19, 2001 after Medel recanted. He was aware of a text message on Kintanar's phone in which Dodong Polinar[16] advised Kintanar that Gonzaga was the "brains" behind Medel's surrender, an idea Gonzaga in turn attributed to Medel himself. Id., ¶ 4. Pates overheard Kintanar and another colonel discuss "damage control." Id. Moreover, Mrs. Kintanar told Pates she was worried that Ding Ding Tantoco was frequently visiting her house. Id. ¶ 5. In July, 2002, after Pates executed the second sworn affidavit, Kintanar called Pates to advise him that should Pates be approached by a reporter, he (Pates) should clear Kintanar's name "by denying everything that was written about him in the newspapers linking him to the murder of Nida Blanca." Id., at ¶6.

Again, the important aspect for Strunk's extradition case of recounting Gonzaga's and Pates' statements is not, in the first instance, their internal inconsistencies, of which there are many, but the fact that they completely shatter Medel's quite clear statements in his confession that he did not know Strunk prior to the murder day. Moreover, rather than corroborating Medel's confession that he did not know who the intended victim was, these statements entirely rebut that fact. Thus, if Medel cannot be believed with respect to his not knowing Strunk, or the intended victim, why is it that he should be believed regarding Strunk's complicity?

And, aside from their impact on the Medel confession, by no means do the inconsistent statements stand on their own as probable cause for Strunk's involvement in murder. The statements as a whole are implausible. In contrast to Medel's account that he was hired to

---

[16] Polinar was Medel's roommate. Apparently, he too has been charged in the murder of Nida Blanca, although he was never mentioned in the Medel confession.

"observe" and did not know who the proposed victim was to be, Gonzaga declares in his first affidavit that Medel confided to him sometime in October that he had been hired to kill Blanca. Why Gonzaga did not report to authorities that Medel planned to kill a beloved and famous actress is not explained. Gonzaga declares that, after the murder occurred, Medel left the premises of the building where they lived and did not return for five days. Why Gonzaga did not report the killer's identity to the authorities after learning the murder had in fact occurred is unexplained. Incredibly, during the time Medel was gone, Medel nevertheless met Gonzaga in the parking lot of their apartments where Medel confessed he had done the deed. Even more incredibly, after they called the Superintendent of the CDIG-PNP immediately after Medel confessed, the Superintendent permitted Medel to remain at large for another week. Why the Superintendent would permit the killer of a beloved Phillippines icon to remain at large for a week is not explained. Most importantly, aside from an overheard phone conversation with a "Rod," and a claim that Medel and Strunk had frequented a piano bar together, no connection between Strunk and Medel is proffered in Gonzaga's first affidavit, leading to the conclusion that although Medel had told Gonzaga before the crime occurred that he had been hired to perpetrate it, and although Medel thereafter confessed he had done it, Medel apparently failed to tell Gonzaga that Strunk was the mastermind. This conclusion, however, is repudiated by Gonzaga in his two later affidavits.

In his second affidavit, Gonzaga declares he had seen Strunk at the home of Gen. Kintanar on November 5, 2001. In his first affidavit, however, he stated he had been away at his home from October 29 to November 5. November 5 was the day he returned in the company of his wife's cousin, and they saw Medel coloring his hair and shining his shoes before he disappeared for the evening. The first affidavit does not mention a stop at the home of Kintanar–it states Gonzaga was traveling that day and only saw Medel about 2 p.m. The time Gonzaga saw Strunk at Kintanar's home or why Gonzaga was at Kintanar's home the day Gonzaga returned from his visit is unexplained. The connection of Kintanar to the crime is unexplained.

Unexplained is how seeing Strunk at Kintanar's home on the same day Medel was primping connects Strunk to the crime.

In the third affidavit, executed after the court commented on problems with Gonzaga's declarations, including the inherent problem with Gonzaga's statement that Medel confessed during the time Medel was gone, Gonzaga declares that the confession had occurred in the parking lot of their apartments. In contrast to the conclusion to be drawn from the first affidavit, Gonzaga specifically declares that Medel said he had been fooled by Strunk because Strunk had reneged on payment. Medel told Gonzaga he wanted to surrender and to pinpoint Rod Strunk as the mastermind and have him arrested. One would assume that information would have been conveyed to Versoza in the subsequent phone call. Why Strunk was not apprehended as soon as Versoza received that information is unexplained. Gonzaga also declares he had seen Strunk at Kintanar's home about four times, in contrast to the previous declaration he had seen Strunk twice at Kintanar's home. This time, Strunk attended the meetings at Kintanar's home in the company of Ding Ding Tantoco, Mike Martinez, Elena, Bernadita, and Noel De La Paz. Why these seemingly critical facts were not previously mentioned is unexplained. Moreover, Gonzaga declares that after Medel recanted, Medel told Gonzaga in a telephone call to Kintanar's house that he would not have surrendered if "Kano" [an American] had paid him. That Medel made telephone calls to Gen. Kintanar after the press conference on November 19, 2001, (while he was in custody of the PNP after his confession) strains belief. Moreover, the declaration of Versoza concerning the events of November 19 belies the conclusion that Medel was able to make telephone calls. <u>See</u> Annex M, 3.07-3.13 (Medel at 6 a.m on November 19 was emotionally disturbed, hysterical and violent, and had to be handcuffed and leg restrained. On the same day, he gave a supplemental statement, attended a press conference, was interviewed by Karen Davila, attended an inquest before DOJ prosecutors, was interviewed a second time, and later again became emotionally upset and tearful.) Versoza says Medel received medical attention on

\\\\\

November 20-21, 2001, the day after the recantation. Annex M., ¶¶ 03.15; 03.18-23. Medel was in the hospital from November 21-23. Annex O, ¶2.

As to the Pates affidavits, the connection between Medel and Strunk is even more tenuous. Only an overheard telephone conversation in which Medel was talking to a "Rod" connects Medel to Strunk.

Moreover, there are other aspects of the evidence presented by the Philippines that detract from the reasonableness of the Gonzaga/Pates statements. The date Medel called the authorities to proffer his surrender varies from declarant to declarant. The August 1, 2002 affidavit of Police Chief Superintendent Jesus Ame Versoza of the PNP-CIDG contrasts with Gonzaga's account of when he and Medel called Col. Versoza. Annex M.[17] Versoza states that the call from Medel expressing his willingness to surrender came at noon on November 17, 2001. Annex M, ¶ 02. Surprisingly, Versoza makes no mention of the November 10, 2001 call described by Gonzaga in his February 2, 2002 statement. One would expect an earlier call to be mentioned if it in fact occurred, and accordingly, the inference to be drawn from the Versoza declaration is that the first time he spoke with Medel was on November 17, 2001.

A "Joint Counter Affidavit" executed on January 18, 2002 by four individuals identified as "P/CINSP" also contradicts the statements of Gonzaga and Versoza. Annex N. This affidavit apparently was prepared in opposition to a suit for abduction and torture filed by Medel. The declarants were part of the Criminal Investigation and Detection Group of the Philippine National Police, ("CIDG-PNP") of which Versoza is identified as the Police Chief Superintendent. In apparent contrast to Versoza's statement, these individuals state that Medel made telephone contact with CIDG on November 16, 2001–they do not indicate with whom the contact was made. Id., ¶ 3.0. The affidavit identifies November 12, 2001 as the date on which the PNP became aware of "a group of persons, which include Medel [who] could have a hand in the

---

[17] The spelling of the superintendent's name is given in some of the documentation as "Versosa."

DOROTHY JONES [Nida Blanca] case. . . ." Id. The implication is that prior to November 12, the PNP did not suspect Medel was involved in the crime, which is implausible if Medel had called on November 10 to arrange his surrender.

A part of the remaining evidence deals with a supposed motive held by Strunk to kill his wife. Affidavits from Elena De La Paz, dated July 27, 2002 (Annex X), August 8, 2002 (Annex Y-1), and June 25, 2003 (Annex Z-1), also are in the extradition request.[18] Elena De La Paz was personal assistant to Nida Blanca. She indicated that Strunk's drug and spending problems had caused his relationship with Nida to sour. Annex X. Moreover, there had been problems caused by Blanca's purchase of a home in Los Angeles for her daughter, Kaye, which did not include Strunk in the title. Id. In September, 2001, Blanca had instructed Elena not to tell Strunk about a real estate transaction involving a San Mateo lot. Id. In a supplementary statement on August 8, 2002, Elena declared Blanca had complained that Strunk was getting even with her by excessive spending because of the fact he was not included in the title of the house she had purchased for her daughter. Annex Y-1. Blanca mentioned the possibility of divorce. Id. , ¶ 09. Elena did not think Strunk appeared concerned about Blanca's disappearance and did not agree that he was the one who initiated the call to Elena's niece, Dita De La Paz, on the night of the murder. Id., ¶ 10. Strunk had a duplicate key to Blanca's car. Id., ¶¶ 10-13. Although Elena controlled Blanca's cell phone, she did not know who had called Blanca's home in White Plains from that phone on the morning of November 6, 2001 at 8:45 a.m., 9:00 a.m., and 11:00 a.m. Id., ¶ 14.

Katherine Alba, bookkeeper for Blanca executed a statement on December 7, 2001. Annex FF-1. She testified that Blanca provided financial support for Strunk, including personal and business matters. Their relationship "went sour" because he was involved with alcohol,

[18] She executed two earlier affidavits, on November 9, 2001, and November 26, 2001. These affidavits were submitted by Strunk in opposition to the extradition request and are summarized below.

drugs, and extravagant expenditures. ¶ 09. Ding Ding Tantoco was a kind, supportive confidant and buddy to Blanca, had been Blanca's friend since Blanca's daughter Kaye was in grade school, and was Blanca's companion, together with Norma and Blanca's mother, when they visited the casino. ¶¶ 13, 28-30.

Katherine Joan Jones Torres, Nida Blanca's daughter, gave a statement on December 7, 2001. Annex HH. She declared that Strunk and her mother had quarreled over his extravagant lifestyle, ¶ 12, that Strunk depended on her mother for "full financial support," ¶10, and that he was "irresponsible, extremely lazy, extravagant and very fond of drinking," ¶ 11. Strunk was not on the title of property owned by her mother, and her mother had insurance, with Strunk as one of several beneficiaries who shared in relatively modest proceeds. Id., ¶¶ 13-16.

In the June 25, 2003 statement, Elena declares that she still resided in the home in White Plains, that it had three entrance/exit doors, and that the door most frequently used by Strunk when he lived there was near his private music room and hidden to the public. Annex Z-1. It was possible for Strunk to leave the house without anyone in the house noticing, and Strunk often did not advise others when he was leaving the house. Id.

The declarations of Elena and others close to her, including those which were not included in the Philippines' submission, are reviewed in the next section in that whatever support remains to corroborate Medel's confession is obliterated by these declarations.

The remaining evidence supplied by the Philippines is now described. However, this evidence does little to connect Strunk with the crime. An affidavit dated June 15, 2003 of NBI Special Investigator Federico O. Criste states that he conducted a test drive from the White Plains Subdivision to the Atlanta Centre and concluded it took only 5-6 minutes travel time between 10 p.m. and 2 a.m. Annex AA.

White Plains security guard Noel Machado executed an affidavit on December 12, 2001, (Annex BB-1), in which he declared that he observed Strunk coming into the subdivision at about 3:10 a.m. on the morning of November 7, 2001. BB-1, ¶ 16. Machado was on duty at Gate

2 of White Plains from 11 p.m. on November 6 to 7 a.m. on November 7. Id., ¶¶ 8-10. He has been told that another guard observed Strunk leave again about 3:30 a.m. Id., ¶ 20. Although unaccompanied visitors in vehicles without stickers were required to present identification to enter the subdivision, Machado did not notice any Strunk relatives or members of Blanca's household enter or leave White Plains that night. Id., ¶¶ 15-26. White Plains security Guard Reynante Cuaton declared he recognized Strunk driving his vannette and leaving the subdivision through gate 2 about 3:30 a.m.[19] Annex CC-1, ¶ 15-18.

A security guard at the home of Gen. Kintanar, Rogelio Salutin, declared on July 27, 2002 that he had seen Strunk visit once at the home of Kintanar in September or October, 2001. Annex DD-1 (now alleged to be a coerced statement). He also testified that Medel and Polinar, together with others who were mostly Kinatar's men, were present when Strunk visited Kintanar. Id., ¶ Q-25. No mention is made of the De La Paz family members, or of Tantoco or Martinez.

Rosalinda Molina, administrator of the Atlanta Centre, declares that she saw Medel at the scene of the crime wearing "black long sleeves" about 9:30 a.m. on the morning of November 7, 2001. Annex EE-1, ¶¶4-5. She saw him again in the elevator lobby on the same day. She noticed him because she thought his outfit, with black long sleeves, was "weird." Id., ¶ 11. When she saw Medel on television, she realized she had seen him at the Atlanta Centre the morning of the crime. Id.[20]

---

[19] Guard Cuaton testified that the three gates were not always open. Gate 3 opened at 5 a.m. and closed at 11 p.m. As to gates 1 and 2, gate 1 was the 24 hour gate from the 1st through the 15th of the month. Annex CC-1, ¶ 11. Presumably, whichever gate was not the 24 hour gate had the same 5a.m.-11 p.m. hours as gate 3. The court in any event assumes that only the 24 hour gate would be open at 3 a.m. If so, unexplained is why guards Cuaton and Machado were observing Strunk coming and going at gate 2 at 3-3:30 a.m. on the 7th of the month when gate 1 was the 24 hour gate on that day of the month.

[20] Molina did not know Medel, but only recognized him from televisions reports of Medel's arrest and subsequent events. It is interesting to note that Medel was given a long sleeved black shirt by Filipino authorities only after his arrest and long after Molina's reported

Norma Sideco, Medel's landlady, executed an affidavit on July 19, 2002. Although she also had executed an affidavit on November 21, 2001, the Philippines did not include that affidavit in the extradition packet. Sideco stated that she had a ten minute conversation with Medel at 8:30 a.m. on November 7, 2001, in which he announced to her that Nida Blanca had been murdered. Annex GG-1. He stayed outside "texting and talking with someone through his cellular phone." Id. at ¶04. He was wearing a white undershirt, shorts, and slippers. Id. at ¶ 08. She did not know whether he had left thereafter, but she did observe his door was slightly open that afternoon. Id. at ¶06. She observed everyone to be calm on November 18, 2001 when Medel surrendered. Id. at ¶ 14.

In sum, even ascribing the possibility of a motive to Strunk, however, tenuous, the court cannot ignore the implausibilities and inconsistencies in the declarations *submitted by the Philippine government.* The evidence in this case is a tangled web of accusation followed by supplementation, and sometimes even further supplementation without regard to consistency of accusation. The significant aspects of the vast majority of "other" evidence submitted by the Philippines squarely rebuts the confession of the one person (Medel) who by reported personal knowledge links Strunk with the murder. Whatever the state of the evidence against Medel, the evidence at this point is simply not reasonably competent to link Strunk with the murder.

*Evidence Submitted by Strunk*

It is not critical at this point to weigh Strunk's evidence since that submitted by the Philippines when viewed as a whole does not impart a reasonable belief in Strunk's complicity. However, one aspect of the Strunk evidence is important because it completely obliterates an important, indeed, essential, part of Medel's confession. That is, the declarations of persons who saw and talked to Strunk at his home on the evening/night of the murder make rendition of events on the night of the murder essentially impossible. And again, if important underpinnings of

---

sightings.

Medel's confession have been completely ripped away, as they have in the respects discussed above, the case against Strunk cannot survive this one more serious blow, even to the extent it has survived at all.

For completeness sake, the court will first categorize the Strunk evidence. Keeping in mind that, at an extradition hearing, "facts contradicting the requesting country's proof of probable cause. . . are inadmissible," Singh, 170 F. Supp. 2d 982, 993, the court has reviewed the thirteen exhibits submitted by Strunk.

***Exhibit 1***. Medel declaration. This declaration has numerous attached exhibits, including a statement of Prosecutor Emmanuel Velasco, Annex A., defending his handling of the case against Medel and Strunk, apparently proffered to counter an assertion that the case against them had been dismissed. A 74 page "Consolidated Affidavit of Recantation and Counter-Affidavit," apparently submitted to a Philippine court at the October 21, 2002 preliminary hearing, is attached as Annex B. Attached to Annex B are several exhibits, confusingly designated as Annex A, B, C, D, E. F, H, and Q.[21] Several of these exhibits are not in English. Some of the exhibits are handwritten and barely legible (Annex A, for example). They include Annex D, the same statement of Prosecutor Emmanuel Y. Velasco, which apparently is a copy of the statement previously referred to as Annex A. Annex B is a memorandum from Roberto C. Omandam of the Public Attorney's office of the Department of Justice in Quezon City, recounting the events leading up to the recantation–out of order in Annex B is an unmarked copy of a letter from Medel asking for admission to the witness protection program of the NBI.

As to the 74 page affidavit of recantation, the court will admit it into evidence, in light of the fact that it explains the recantation in open court already reviewed at the extradition

---

[21] The court has encountered considerable difficulty enumerating the exhibits to exhibits which are attached to the material submitted by Strunk because of the out-of-sequence lettering of the exhibits to the exhibits. Moreover, several exhibits have multiple designations appearing variously at the top or at the bottom of the pages, apparently because they have been used and reused as exhibits in various proceedings in the Philippines.

hearing, and considering that the corroborating evidence surrounding the original confession is so contradictory, vague, and conflicting. As to the rest of the Medel declaration, including the exhibits to the recantation and the other exhibits, the court finds them cumulative, offered to contradict the evidence presented by the Philippines, and unnecessary to resolution of this case.

***Exhibit 1A***. Rod Strunk Statement of November 10, 2001. The court will admit this declaration as explanatory of the whereabouts of Strunk on the night of the crime. Strunk stated that the De La Paz family returned to White Plains about 12:30 a.m. to report on the results of their visit to the Atlanta Centre. He went to the Atlanta Centre about 2-3 a.m. to check himself. There was no guard on duty. Elena and Ding-Ding took his van about 5-6 a.m. to check at the casino. At 8 a.m, Dita called to inform him the body of Blanca had been found. He arrived back at the Atlanta Centre about 8:30-9 a.m.

***Exhibit 2***. Translations by attorney Mallonga of various declarations prepared in connection with the investigation into the Nida Blanca murder. Many of the family members gave several sworn statements, not all of which were presented by the Philippines in support of the extradition request. The material in exhibit 2 includes three declarations by Elena De La Paz which were not included with the declaration by the same witness submitted by the Philippines. Declarations by the same witnesses which explain those proffered by the Philippines to support the extradition request are admissible in this extradition proceeding, and the court will consider them. Strunk also submitted declarations of De La Paz family members Noel and Bernadita De La Paz. These declarations, too, are explanatory of Elena's declarations and also of Strunk's whereabouts on the night of the crime, and the court also will consider them. They are summarized as follows. The numbering and lettering of these declarations, submitted apparently in Tagalog and in English, is confusing, but the court has attempted to use the same designations as submitted by Strunk.

Annex A-1 to Mallonga declaration. November 9, 2001 statement of Elena De La Paz. Nida Blanca left home, driving her own car, about 12:30 in the afternoon on November 6,

2001. She did not come back home that day. Elena was told that Ding Ding Tantoco[22] and Norma visited Blanca that morning. Elena spoke by telephone to Blanca twice that afternoon. When Blanca had not returned home by 10 p.m., Elena called Ding Ding,[23] another friend, and Noel De La Paz.[24] Noel, his wife Dita,[25] and their child went with Elena to the Atlanta Centre about 11:30 that night. She asked a guard to check the 6th floor for Blanca's car, and, after going[22] to check, the guard reported it was still there. They got back to the house around 1:00 a.m. on November 7, 2001, and told Strunk that they had not found Nida. About 6:30 a.m., Elena and Ding Ding Tantoco looked for Nida at Casino Filipino, but she was not there. Blanca had one insurance policy naming her daughter, Katherine Torres, as beneficiary. Blanca had no problems with her family.

Annex B-1. November 21, 2001 statement of Elena. In this statement, Elena elaborates concerning calls she made between 9-10 p.m. to other friends of Blanca. She saw Strunk between 9:30-10:00 p.m, in his room, where she advised him she was worried about Blanca. Around 11 p.m. when Dita and Noel arrived, Strunk also spoke to them. He was left at home when they went to the Atlanta Centre in case Blanca called. They arrived back home around 11:30-11:45, where they spoke with Strunk. Because a guard at Casino Filipino advised Noel by telephone that Blanca had been seen there around 11 p.m., Elena then went to bed. She awoke around 2-3 a.m., and again spoke to Strunk who was waiting for Blanca. He told Elena he had been to the Atlanta and looked in Blanca's car and had not seen anything. Rod drove Elena to Ding Ding's house around 6 a.m., and the two women drove to the casino, using Strunk's car. At

---

[22] The name is spelled "Deng-deng."

[23] She did not speak to Tantoco, who was reportedly asleep at her home.

[24] The surname is spelled "Dela Paz."

[25] The court is not sure whether the correct spelling of the name is "Dita" or "Ditas."

that point they were advised, contrary to the guard's report, that Blanca had not been seen at the casino. Elena then called a secretary at the Atlanta Centre, who returned the call to report guards had found the body of Blanca in her car.

Annex C-1. November 27, 2001 affidavit of Elena. Elena's account in this statement essentially corroborates her previous statements, although some of the times vary. Between 10 and 11 p.m., Elena contacted Dita and Noel about Blanca's failure to return home. They went to the Atlanta Centre where a guard advised them Blanca's car was still there. Noel called the casino around 11 p.m. She saw Strunk about 2 a.m. and he advised her that he had gone to the Atlanta Centre, looked inside the car, and saw no one. She and Ding Ding drove to the Casino about 5 a.m. They called the secretary who later reported in a return call that the body of Blanca had been found.

Annexes D, D-1, E, E-1, F, F-1, G, G-1, Annex H. Statements of various Filipinos to establish that the Salutin affidavit was coerced. The court will admit these statements as tending to explain the circumstances surrounding the Salutin affidavit.

Annex I-A-B. Bernardita De La Paz ("Dita"), a relative of Elena, gave a statement on December 15, 2001. She spoke with Elena several times on the evening of November 6, 2001. Elena called her around 10:30 to report she was getting very worried, and Dita and her husband Noel left for White Plains to get Elena and start looking for Blanca. Dita saw both Elena and Strunk at 11 p.m. Dita, her husband, and Elena arrived at the Atlanta Centre about 11:15 p.m. and returned to White Plains a little before midnight, where they saw Rod Strunk at the house and talked with him for about 15 minutes. Noel called the casino about 12:20 a.m. They left between 12:30 and 12:45 a.m., arriving at their home a little before 1 a.m. Elena sent Dita text messages, using Blanca's phone, every hour from 2 a.m. to about 6 a.m., informing Dita that Blanca had not arrived home. Elena, who then was with Ding Ding Tantoco, called about 8:30 to ask Noel to pick up Rod because the body of Blanca had been found in her car at the Atlanta Centre. Noel left for White Plains.

Annex J, A-B. Noel De La Paz executed a declaration on November 9, 2001.[23] Annex J. He verified that he, his wife and daughter went to White Plains to pick up Elena and search for Blanca. They drove to the Atlanta Centre, and did not find her there. They returned to White Plains, where he saw and talked to Strunk and called the casino. After returning home, he observed his wife exchanging text messages with Elena between 1-2 a.m. Sometime after 8 a.m., they learned from Elena that Blanca's body had been found in her car, and he left to pick up Strunk. They then drove to the Atlanta Centre.

***Exhibit 3***. Second declaration of Filipino attorneys with various pieces of evidence not presented by the Philippines. In addition to photographs, evidence collected at the crime scene, investigation and laboratory reports, including DNA and polygraph tests, this declaration includes duplicates of the declarations of Elena and Dita discussed above, as well as Annex J, a second affidavit of Norma Sideco, executed September 11, 2002.[24] In this declaration, proffered to clarify her earlier statements of November 21, 2001[25] and July 22, 2002, Ms. Sideco states, inter alia, that she saw Medel at his apartment every day between November 6, 2001 and November 16, 2001. Annex. J. at ¶¶ 9-13. The court will admit this as evidence as explanatory of the Sideco affidavit submitted by the Philippines and has considered it. Sideco declares that she saw Medel about 8:20 a.m. on November 7, 2001, and again about 10:30 a.m. She saw him on November 8, 9, 10, 11, 12, 14, 15, and 16. The affidavit apparently is meant to clarify when Medel told Sideco that Nida Blanca was a murder victim. Unfortunately, it is unclear whether the time was 10:30, 8:30, or 9:30 a.m. The typewritten time of 10:30 is crossed out, and handwritten times of 8:30 a.m. and 9:30 a.m. are both interlined in the document. Annex J, ¶ 18. Attached as

---

[23] He also executed an supplemental affidavit dated November 21, 2001. See pp. 12-13, Def's Ex. 3.

[24] Unclear is why there are several copies of this declaration in Exhibit 3, identified variously as Annex J, Annex M, and Annex Q.

[25] The court has not located this statement anywhere in the file.

Exhibit M is the declaration of Mary Jane P. Aguirre, executed on November 21, 2001. The court will admit this declaration as explanatory of the whereabouts of Strunk on the night of the murder. Ms. Aguirre was a foster child of Nida Blanca who lived at the White Plains home. When she arrived home at 6:30-7 p.m., only the Nissan vannette was in the garage. She saw Strunk on the night of the murder at the home at 7:30 p.m. When she went to bed around 10 p.m., the vannette was still parked outside.

The court also will admit the laboratory reports, discussed later.

***Exhibit 4***. Declarations of Noel and Dita De La Paz. Attached as Annex A and B. to Exhibit 4 are affidavits of Noel De La Paz dated November 9, 2001 and November 21, 2001.[26] The court already has admitted and considered the November 9, 2001 affidavit. In the November 21, 2001 affidavit, Noel sets out a more specific timeline for the night of the murder. He confirms that he, his wife, and daughter arrived at the White Plains home at 11:00 p.m. They saw Rod there. They, with Elena, were at the Atlanta Centre between 11:05- 11:30 p.m. They returned to the White Plains home about 11:40. They remained at the home until midnight or 12:20 a.m. He picked Rod up at 8:10 a.m. and took him to Atlanta Centre. Exhibit 4 also contains a new affidavit of Noel dated August 8, 2003, Annex E., denying the meeting at Gen. Kintanar's house, which the court declines to consider, as it is proffered merely to contradict the Gonzaga affidavit. Annex C is a statement of Bernadita dated November 9, 2001. The court was unable to locate an English translation of this statement. A declaration dated December 15, 2001, identified on the bottom of the page as Annex T, is also attached. The court has already reviewed the December 15, 2001 affidavit of Bernadita. The court declines to consider the new affidavit of Dita, Annex F, dated August 8, 2003, for the same reasons it declined to consider the affidavit of Noel executed the same day. Finally, attached as Annex U, marked at the bottom of the page, is the affidavit of Patricia Erika Dela Paz , the daughter of Dita and Noel. The court will admit this

---

[26] This affidavit also is attached as Annex L to Exhibit 3.

affidavit and consider it as explanatory of the whereabouts of the De La Paz family on the night of the crime. Patricia accompanied her parents to the home at White Plains about 11:00 p.m. Patricia states they were at the Atlanta Centre between 11:15 and 11:50 p.m. They returned to White Plains and left there about 12:30 a.m.

***Exhibit 5***. Declaration of Filipino Counsel consisting of argument, which the court declines to admit as evidence.

***Exhibit 6***. Martinez Habeas decision on appeal. Judicial notice may be taken of court records. Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981)). The court takes judicial notice of this court record to establish the recent disappearance of Mike Martinez.

***Exhibit 7***. Conditions in Philippine Jails. The court declines to consider this exhibit as it is insufficiently probative to make any comment on jail conditions. The court rejects any argument that conditions in the Philippine jails warrants non-extradition.

***Exhibit 8***. Rolly Kintanar newspaper reports. The court declines to consider the material in this exhibit, except to establish the fact of Rolly Kintanar's relationship to General Kintanar.

***Exhibit 9***. Newspaper report re Nida Blanca death The court takes notice of the fact that the report was made.

***Exhibit 10***. October 3, 2002 newspaper account of shooting of former soldier who claimed to have been offered 100,000 pesos to kill Blanca. The court declines to consider this as evidence.

***Exhibit 11***. Videotape of news coverage of Blanca murder. The court did not consider this item.

***Exhibit 12***. Videotaped television documentary. The court did not consider this item.

\\\\\

***Exhibit 13***. Compact disc with Medel signing confession, recantation, and search of Medel apartment for knife. This video was submitted by the Philippines and reviewed by the court at the extradition hearing. It has been considered.

The court focuses on only two aspects of the evidence submitted by Strunk.[27] First of all, the declarations regarding Strunk's presence in his home on the evening/night of the murder completely refute any notion that he was continuously with Medel from the early evening of November 6 through midnight or thereabouts. These declarations, made by persons who apparently had no interest to protect Strunk, and indeed, some of whom supplied their thoughts about a possible motive for Strunk to have committed the crime, unequivocally demonstrate that Medel's timeline was impossible. While the exact times members of the De La Paz family saw Strunk at White Plains differ somewhat, Strunk cannot be running about town with Medel throughout the evening and night, looking for Martinez, eating at restaurants, looking for the "wife of the Chinese," and arriving at the Atlanta Centre when at that same time Strunk is talking to various persons at his home. If Medel's chronology is to be believed, he and Strunk were parked adjacent to Blanca's car at the very time the Atlanta Centre security guards were checking Blanca's car at the request of the De La Paz family. While Strunk may have been able to leave the White Plains house without being observed, the court finds it unlikely that he could come and go and commit the murder after the De La Paz family members knew Blanca was missing and in between the times the De La Paz family members were searching for Blanca and returning to the home to discuss the results of their search with Strunk. If Medel's confession is so refuted in this important chronology of Strunk's complicity, *it cannot be believed in any material respect.*

\\\\\

---

[27] The court will make no formal finding on Medel's accusation of torture. The written evidence is insufficient for that purpose. The court reiterates that it has no confidence in anything that Medel states whether he is implicating or exculpating himself and others. Moreover, the Philippines has presented evidence outside of government officials, that of media reporters, tending to show that Medel did not appear to have been tortured.

Moreover, the court watched the video of the police entering Medel's apartment to retrieve the murder weapon initially confessed by Medel to have been hidden under the sink. First, as the court recollects, the knife was found in a place where knives would usually be found–in the open part of the kitchen and not under the sink where Medel had indicated that the knife was hidden. Moreover, this kitchen knife tested negative for the presence of human DNA. Strunk's Annex X, Ex. 3. Medel did not declare that he cleaned the knife before hiding it, and the uncleaned murder weapon would surely have had human DNA on it. Moreover, the hair and fiber samples taken from the scene could not be matched to Medel. Strunk's Ex. 3, Annex G, H.[28] Again, the court's point is that if Medel's participation in the murder cannot be supported by objective evidence, Strunk's reported involvement by Medel is only that much more tenuous.

Norma Sideco's affidavit goes no distance in implicating Strunk. The declaration of Rosalinda Molino has nothing to do with Strunk. As to Medel, if it is proffered to establish that Medel remained at the scene of the crime on the morning the body was discovered, it is contradicted by both Gonzaga and Sideco, who saw Medel at his apartment during the same time frame–Molina's testimony as to when she saw Medel is inconsistent with the declaration of Gonzaga that Medel was at his apartment during that time. Sideco's declarations she observed Medel at his apartment between 8:30 and 10:30 a.m. the morning after the murder, wearing shorts and an undershirt, are inconsistent with the declaration of Molina declaring she saw him at the Atlanta Centre at 9:30 a.m. wearing a black long sleeved shirt.

*Evidence Not Submitted*

While the Philippines is not required to submit all their evidence against the extraditee with a request for extradition, the lack of probable cause connecting Strunk to the crime is highlighted by the fact that corroborating evidence which could have bolstered the case is

---

[28] Although the court's copy of Annex H is not readable, the court accepts the representation from Strunk's attorneys, Ex. 3 at 7-8, that the Annex H report discloses that fibers from clothing Medel purportedly wore the night of the crime did not have characteristics similar to fibers recovered from Blanca's car.

missing. For example, although the evidence is replete with references to critical cell phone communications, not a single cell phone record is proffered to substantiate that any of those communications took place. Although Strunk reportedly frequented a piano bar with Medel and Polinar, not a single affidavit of a person who observed them there is proffered. Although Strunk purportedly accompanied Medel to a restaurant where they spent over an hour the night before the crime, no person or record is proffered to establish that the restaurant was open at the time in question or that Strunk and Medel were seen together there. Apparently no statement was ever taken from supposed organizer Mike Martinez, even though he was at one time in the custody of the Philippine police. Incredibly, a police official testified in a Philippines judicial proceeding that the police were "too busy" to talk with the testified-to-by-Medel organizer of Blanca's murder. Strunk Exhibit 1, annex B at p.21. If Strunk was coming from and going to the Atlanta Centre from White Plains during the night Blanca was missing, the court did not discover a record or declaration from the security guards posted at the Atlanta Centre to establish such goings and comings. To the extent that Strunk's connection to the crime is built upon Medel as the killer, not a single hair or fiber or fingerprint or other piece of physical evidence connecting Medel to the crime has been presented.

Finally, Strunk's motive for the crime is not readily apparent. Some testimony suggests that the wife who had supported him had threatened to divorce him. Equally, if not more, compelling is other evidence that Strunk had little, if any, financial gain to expect from the murder. He was not on the title of property owned by his wife because they were not legally married in the Philippines, a fact which must have been known to him since Blanca's divorce and remarriage to Strunk had taken place in the United States. He stood to collect little, if anything, from insurance. In short, it appears from this record that Strunk had little to gain and much to lose from the murder.

\\\\\

\\\\\

*Conclusion*

Keeping in mind that the purpose of this proceeding is to connect *Strunk*, not Medel, to the murder of Blanca, the evidence *submitted by the Philippines* concerning Strunk's participation in the murder of Blanca is so inconsistent and conflicting that it provides little competent evidence to support the conclusion that Strunk hired Medel to murder Blanca. Dealing the final blow to a case that was already on the ground, the competent, admissible evidence *submitted by Strunk* obliterates the case presented by the Philippines resting on the Medel confession. In sum, on the totality of the record, the court cannot find probable cause to reasonably believe that Strunk likely conspired with Medel to have Nida Blanca killed. Accordingly, the court denies the request for a certificate of extradition.

Many persons are deeply concerned about the tragic death of a beloved citizen of the Philippines. All desire that the totality of persons involved in that murder be brought to justice. This decision does not say that the Philippines could never make a case against Strunk should new, competent evidence be submitted.[29] This decision does say that such a case has not presently been made even given the rather de minimis standards for extradition.[30]

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

---

[29] The Philippines/United States has no right to appeal a decision not to extradite. United States v. Doherty, 786 F.2d 491, 501 (2nd Cir. 1986); Hooker v. Klein, 573 F.2d 1360, 1365 (9th Cir. 1978). However, double jeopardy principles are not in play, and a later, good faith attempt at extradition can be made. Id. at 1366-68.

[30] The court states that nothing in this opinion is meant to criticize the presentation of the case by AUSA Ken Melikian. Mr. Melikian did his customary, professional presentation of evidence, and his customary, informative legal briefing. However, as the decision makes clear, the evidence given to Mr. Melikian was not competent. Good as he is, Mr. Melikian could not perform legal alchemy.

Accordingly, the request for a CERTIFICATE OF EXTRADITION IS DENIED.

IT IS FURTHER ORDERED THAT Roger Lawrence Strunk is to be released from custody immediately.

DATED: November 12, 2003.

GREGORY G. HOLLOWS
U. S. MAGISTRATE JUDGE

GGH/055
strunk.exhr.wpd

mac

United States District Court
for the
Eastern District of California
November 12, 2003

* * CERTIFICATE OF SERVICE * *

2:03-mc-00126

Strunk

v.

---

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on November 12, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

Jeffrey S Kravitz
Law Offices of Jeffrey S Kravitz
2728 J Street
Suite 204
Sacramento, CA 95816

VC/GGH

Kenneth J Melikian
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA 95814

Jack L. Wagner, Clerk

BY: ____________________
Deputy Clerk